UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BETHANY SNYDER,

          Plaintiff,                             Hon. Janet T. Neff

v.                                       Case No. 1:09-CV-774

COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.
_____/


## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. §

636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and

recommendations for disposition of social security appeals, the undersigned recommends that the

Commissioner's decision be **reversed and this matter remanded for further factual findings**

**pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 36 years of age at the time of the ALJ's decision. (Tr. 29, 114). She completed two years of college and worked previously as a cashier, painter, and child care provider. (Tr. 199, 203).

Plaintiff applied for benefits on September 29, 2004, alleging that she had been disabled since March 13, 2003, due to diabetic neuropathy that affected her feet, arms, and hands. (Tr. 114-16, 127, 198). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 30-98). On March 12, 2007, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, David Holwerda. (Tr. 721-84). In a written decision dated August 23, 2007, the ALJ determined that Plaintiff was not disabled. (Tr. 15-29). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

Treatment notes dated September 12, 2002, indicate that Plaintiff suffers from insulin-dependent diabetes and diabetic neuropathy. (Tr. 389). Treatment notes dated January 16, 2003, indicate that Plaintiff's diabetes is "well controlled." (Tr. 387).

On or about March 13, 2003, Plaintiff underwent an exostectomy[1] procedure on the fifth metatarsal of her right foot. (Tr. 384-85).

On July 17, 2003, Dr. Richard Seiler performed surgery on Plaintiff's left foot. (Tr. 280-81). Specifically, Plaintiff underwent "forefoot reconstruction involving correction of hammer toes and a fifth metatarsal osteotomy with percutaneous pin fixation on the left foot." (Tr. 282). On July 29, 2003, Plaintiff was diagnosed with cellulitis of the left lower extremity due to "over activity." (Tr. 284-86, 380). Plaintiff was admitted to the hospital and treated with antibiotics. (Tr. 284-85). Plaintiff was discharged from the hospital on August 3, 2003, at which time Dr. Seiler instructed her to continue "resting and elevating" her foot, engage in only "minimal ambulation," and wear "a surgical shoe only." (Tr. 282-83).

Treatment notes dated August 21, 2003, indicate that Plaintiff's toes "are in good alignment." (Tr. 378). On September 4, 2003, Plaintiff reported "no complaint except that she is unable to fit into her regular shoe because of thickness in the foot." (Tr. 378).

On December 10, 2003, Plaintiff participated in a consultive examination conducted by Dennis Mulder, Ed.D. (Tr. 292-96). The results of a mental status examination were

---

[1] Exostectomy is the process by which an exostosis is removed. *See* What is Exostectomy, available at http://www.foot-care.org/bunion/exostectomy.php (last visited on July 7, 2010). An exostosis is a benign tumor of bone and cartilage generally located under the toenail which may press upwards deforming the nail plate and/or soft tissues. *See* Foot Disorders, Subunqual Exostosis, available at http://www.foottalk.com/d_exostosis.html (last visited on July 7, 2010).

unremarkable. (Tr. 294-95). Plaintiff was diagnosed with adjustment disorder with depressed mood and her GAF score was rated as 55-60. (Tr. 295).

On February 2, 2004, John Gallagher, Ed.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 301-16). Determining that Plaintiff suffered from adjustment disorder with depressed mood, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 302-10). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 311). Specifically, the doctor concluded that Plaintiff experienced no restrictions in the activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced extended episodes of decompensation. (Tr. 311).

On September 2, 2004, Plaintiff was examined by Dr. Seiler. (Tr. 375). Plaintiff reported that she "has been wearing her shoes regularly out doors, although spending a little time inside barefoot." (Tr. 375). Plaintiff reported that she was not experiencing any pain. (Tr. 375).

On September 18, 2004, Plaintiff reported to the emergency room complaining of redness and swelling of her right foot. (Tr. 327). Plaintiff reported that because of her diabetic neuropathy she "does not feel her feet very well." (Tr. 327). An examination of Plaintiff's foot revealed that she suffered "multiple" puncture wounds from a tack located in the bottom of her shoe. (Tr. 327). The doctor observed no evidence of a foreign body in Plaintiff's foot. (Tr. 327). Plaintiff was given medication and discharged. (Tr. 327). Plaintiff's foot did not improve with medication and she was admitted to the hospital on September 30, 2004. (Tr. 337-38). Plaintiff was diagnosed with cellulitis. (Tr. 337-38). Dr. Seiler performed an "incision and drainage" procedure, after which

Plaintiff's condition improved. (Tr. 333-34, 337-38). Plaintiff was discharged on October 2, 2004, with instructions to "remain partial weightbearing on the foot in a walking boot and walker assistance." (Tr. 338).

On October 14, 2004, Plaintiff reported that she "feels good" and "is staying off [her] foot as much as possible and using the CAM walker." (Tr. 372).

On October 25, 2004, Plaintiff was examined by Dr. Seiler. (Tr. 371). Plaintiff reported that she was experiencing increased swelling of her right foot. (Tr. 371). An examination of Plaintiff's foot revealed that it was "extremely swollen, red, and shiny around the mid foot." (Tr. 371). When the doctor "manually stress[ed]" Plaintiff's foot, he felt "unstable joints and clunking." (Tr. 371). Plaintiff's forefoot was "abducted compared to the rearfoot." (Tr. 371). X-rays revealed "a complete dorsal lateral dislocation of [the] Lis Francs joint." (Tr. 371). Dr. Seiler diagnosed Plaintiff with Charcot arthropathy[2] of the right foot. (Tr. 371). Plaintiff was instructed to rest and elevate her foot. (Tr. 371).

On November 18, 2004, Plaintiff was examined by Dr. Seiler. (Tr. 370). Plaintiff reported that she was experiencing "no pain in the foot," but "is keeping all her weight off of her foot just occasionally putting it down for transfers." (Tr. 370). An examination of Plaintiff's foot revealed "significant forefoot abduction" as well as two ulcers. (Tr. 370). The doctor performed a "full thickness debridement" of Plaintiff's foot. (Tr. 370). Plaintiff was prescribed pain medication

---

[2] Charcot arthropathy "is a complication of diabetes that almost always occurs in those with neuropathy (nerve damage)." *See* Charcot's Foot, available at http://www.epodiatry.com/charcot-foot.htm (last visited on July 7, 2010). Charcot's arthropathy causes the bones in the foot to "become weakened" and "fracture easily, even without there being any major trauma." Also, the muscles in the foot "lose their ability to support the foot correctly." Because those suffering from this condition experience a decreased ability to sense pain, minor trauma to the foot often goes undetected and untreated which "leads to slackness of the ligaments (laxity), joints being dislocated, bone and cartilage being damaged" and "severe deformities of the foot." *Id.*, *see also*, *Brodish v. Federal Express Corp.*, 384 F.Supp.2d 827, 828 n.2 (D. Maryland 2005); *Meadows v. Commissioner of Social Security*, 2008 WL 4911243 at *11 n.2 (S.D. Ohio, Nov. 13, 2008).

and antibiotics. (Tr. 370). Dr. Seiler diagnosed Plaintiff with osteomylitis with Charcot foot deformity. (Tr. 370). On December 28, 2004, Plaintiff reported that her right foot was "swollen and more painful" and that she was "having a hard time fitting into her CROW walker."[3] (Tr. 368).

On February 25, 2005, Plaintiff was examined by Dr. Seiler. (Tr. 531). An examination of Plaintiff's right foot revealed that the forefoot was "grossly dislocated laterally with a very large prominence medially at the medial cuneiform." (Tr. 531). The doctor further observed that "[t]he 1st metatarsal is in alignment with the 2nd cuneiform and all the metatarsals. . .at the Lis Franc's joint are laterally dislocated with pes planus[4] foot structure." (Tr. 531).

On March 28, 2005, Plaintiff underwent surgery on her right foot to treat her Charcot arthropathy. (Tr. 533-35). Specifically, the surgeon performed the following procedures: (1) lisfranc joint fusion; (2) anterior cuneiform fusion; (3) navicular cuneiform fusion; (4) lengthening and tightening of the Achilles tendon; and (5) application of multiplanar external frame fixation of the foot and ankle. (Tr. 529, 533-35).

On April 21, 2005, Dr. Seiler reported that Plaintiff's "foot looks great" and "is in good position." (Tr. 528). On May 19, 2005, Dr. Seiler removed the external frame from Plaintiff's right foot and ankle. (Tr. 526).

---

[3] A C.R.O.W. (Charcot Restraint Orthotic Walker) is a combination ankle foot orthosis and custom boot. *See* Crow Boot, available at http://www.oandp1.com/products/neurocrow.asp (last visited on July 7, 2010). The C.R.O.W. "was developed for patients with severe charcot changes of the foot and ankle where a more traditional means of treatment was not satisfactory." The device "is in essence a bivalved copolymer full foot enclosure ankle foot orthosis with a rocker bottom sole." *Id.*

[4] Pen planus is a condition in which the arch or instep of the foot collapses and comes in contact with the ground. *See* Pes planus, available at http://www.nlm.nih.gov/medlineplus/ency/article/001262.htm (last visited on July 7, 2010).

On June 9, 2005, Plaintiff reported that she was experiencing "no complaint." (Tr. 525). She was instructed to continue using her CAM walker.[5] (Tr. 525). On July 7, 2005, Plaintiff reported that "things are going well" with "no complaints." (Tr. 525). Dr. Seiler reported that Plaintiff's foot "looks great." (Tr. 525). The doctor indicated that Plaintiff "will stay in the CAM walker until she can have custom shoes made." (Tr. 525).

On October 20, 2005, Plaintiff was examined by Dr. Seiler. (Tr. 524). Plaintiff reported that she was "happy with her new extra depth shoes." (Tr. 524). The doctor noted that Plaintiff's shoes have "a custom molded insole on the right and a rocker bottom sole applied and the left side has a standard multi-density insert." (Tr. 524). The doctor further observed that Plaintiff's shoe "does not seem to contour her high arch well." (Tr. 524). Dr. Seiler diagnosed Plaintiff with Stage III Charcot foot deformity[6] on the right side and diabetic neuropathy bilaterally. (Tr. 524).

> X-rays of Plaintiff's right foot, taken on February 15, 2006, revealed:
>
> Post surgical changes with sclerosis and spurring involving the midfoot and the bases of the metatarsals. There is narrowing of the joint spaces between the cuneiform and cuboidal bone. One of the fusion pins has fractured on the lateral aspect of the foot compared to the last exam of 5/25/05. There are moderate sized calcaneal spurs that are unchanged.

(Tr. 464).

---

[5] A CAM walker is a walking boot that limits the movement of the ankle or foot. *See* Cam Walker, available at http://www.scheckandsiress.com/orthotic_care/Cam_Walker.pdf (last visited on July 7, 2010). The walker contains an adjustable ankle joint that can be set to restrict movement or allow a set amount of movement. *Id.*

[6] There are three stages to Charcot arthropathy. *See* Diabetic Charcot Foot, available at http://www.footanklepain.ca/docs/diabetic_charcot_foot.pdf (last visited on July 7, 2010). Stage I is the fragmentation or destruction phase. During this stage, the joint and surrounding bone is destroyed. Stage II is the coalescence stage, during which the acute destructive process slows down and the body begins to try and heal itself. Once the acute process is resolved and the healing on-going, Stage III begins. This is a consolidation or reconstruction phase during which the bones and joint heal. However, the foot is often deformed, and if there has been sufficient destruction, there may be residual instability. Fitting shoes may be very difficult and prescription footwear and diabetic orthotics are important to help prevent ulcer formation over deformed areas. *Id.*

X-rays of Plaintiff's right foot, taken on April 14, 2006, revealed:

> There is an apparent midfoot fusion surgery with joint spaces still visible. Calcaneal spurring. No acute fracture is seen. There is progression of the spurring compared to the old exam of 2/15/06. The fractured pin is unchanged.

(Tr. 463).

On March 30, 2006, Plaintiff reported that she "is going on vacation to Minnesota." (Tr. 364).

On May 4, 2006, Plaintiff was examined by Dr. Seiler. (Tr. 363). Plaintiff reported experiencing "discomfort in her right ankle." (Tr. 363). The doctor reported that "[g]enerally the foot and leg are greatly improved over a few weeks ago but there is still a little swelling and warmth generally around the ankle and lower leg on the right side compared to the left." (Tr. 363). Dr. Seiler diagnosed Plaintiff with early Charcot arthropathy of the right ankle area and severe diabetic neuropathy with acquired foot deformity. (Tr. 363). Plaintiff was instructed to "have a new walker made" because "the ones she had made a few weeks ago was too tight and the old one does not fit her new constructed foot shape." (Tr. 363). In the meantime, Plaintiff was instructed to "continue minimal ambulation." (Tr. 363).

On May 30, 2006, Dr. Seiler reported that Plaintiff's "foot in general looks pretty good" and "seems to be stable as far as the Charcots foot deformity goes." (Tr. 362). The doctor also instructed Plaintiff "to just forget about getting the walker fabricated." (Tr. 362).

X-rays of Plaintiff's right lower extremity, taken on July 13, 2006, revealed "mild" spurring of the medial femoral and tibial condyles, with no evidence of fracture or dislocation. (Tr. 392). The ankle mortise was "intact" and there was no evidence of knee joint effusion. (Tr. 392).

On July 20, 2006, Plaintiff reported that she "stopped using the CAM walker because her leg is feeling better and her right hip is starting to bother her because of the CAM walker." (Tr. 361). Dr. Seiler reported that there was "no instability in [Plaintiff's] feet." (Tr. 361).

On July 24, 2006, Plaintiff was examined by Dr. Craig Kuesel. (Tr. 514-16). Plaintiff reported that she was experiencing numbness, tingling, and pain in her hands, wrists, and forearms. (Tr. 514). Tinel's sign was present over the bilateral carpal tunnels. (Tr. 514). Plaintiff exhibited 4/5 grip strength without evidence of muscle atrophy or sensory deficits. (Tr. 514). Plaintiff participated in a nerve conduction study, the results of which were "consistent with mild carpal tunnel compression of both median nerves." (Tr. 516). Dr. Kuesel diagnosed Plaintiff with "fairly mild" bilateral carpal tunnel syndrome. (Tr. 515). The doctor indicated that Plaintiff "may benefit from bilateral wrist splints." (Tr. 515).

On August 17, 2006, Plaintiff reported that she was experiencing "increased pain" in her feet "for the past week or two." (Tr. 361). The doctor observed that Plaintiff's "feet and legs are redder" and that her feet were "warm." (Tr. 361). Dr. Seiler also observed no evidence of gross instability, open lesions or signs of infection." (Tr. 361).

On September 19, 2006, Plaintiff reported that her "left foot does not bother her" and that she was "still fairly active on her feet." (Tr. 359).

On October 19, 2006, Plaintiff participated in a duplex venous sonogram examination of her left leg, the results of which were "negative." (Tr. 391). X-rays of Plaintiff's left foot, taken the same day, revealed "deformity of the fifth metatarsal distally consistent with [an] old osteotomy or fracture." (Tr. 390).

On October 27, 2006, Dr. Seiler performed an exostectomy procedure on the fifth metatarsal of Plaintiff's left foot. (Tr. 354-55).

On December 12, 2006, Plaintiff was examined by Dr. Seiler. (Tr. 522). Plaintiff reported that she was experiencing pain and swelling in her right foot. (Tr. 522). The doctor reported that Plaintiff's right foot was "minimally warm and swollen" and that "her medial arch appears strong" and "in good position." (Tr. 522). The doctor observed "significant degenerative changes," but noted that the fourth and fifth metatarsals of Plaintiff's right foot appeared "to be in proper placement." (Tr. 522). Dr. Seiler believed that Plaintiff's discomfort was caused by arthritis. (Tr. 522).

Following a December 28, 2006 examination, Dr. Seiler reported that Plaintiff's left foot was "looking especially good." (Tr. 522). On January 23, 2007, the doctor reported that "the left fore foot has healed it still is puffy and prominent in the soft tissues at the metatarsal head with just a slightly raw area at the incision." (Tr. 521).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from (1) diabetes mellitus with peripheral neuropathy and (2) a history of multiple foot surgeries, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 17-22). The ALJ concluded that while Plaintiff had no past relevant work experience, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 27-29). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[7] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v.*

---

[7] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light[8] work subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) she can stand/walk for two hours during an 8-hour workday; (3) she can sit for six hours during an 8-hour workday; (4) she cannot use her right lower extremity to perform pushing or pulling activities, including the operation of foot/leg controls; (5) she cannot perform work that subjects her to more than minimal vibration; (6) she cannot climb ladders, ropes, or scaffolds; (7) she can only occasionally balance, stoop, kneel, crouch, or crawl; and (8) she cannot perform that exposes her to temperature extremes. (Tr. 23).

The ALJ determined that Plaintiff has no past relevant work experience, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

---

[8]  Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert David Holwerda.

The vocational expert testified that there existed approximately 5,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 763-66). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006) (870 jobs in region constitutes a significant number).

I.          Plaintiff does not meet the Requirements of a Listed Impairment

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled. Plaintiff asserts that her condition satisfies two of the impairments identified in the Listing. Plaintiff bears the burden of establishing that she satisfies a Listed impairment. *See, e.g., Bingaman v. Commissioner of Social Security*, 186 Fed. Appx. 642, 645 (6th Cir., June 29, 2006).

A.     Section 9.08

Plaintiff asserts that she is entitled to disability benefits because she satisfies the requirements of section 9.08(A) of the Listing of Impairments. The ALJ found that Plaintiff's impairments did not meet the requirements of this specific listing. Section 9.08 of the Listing provides, in relevant part, the following:

9.08 Diabetes Mellitus. With:

A.     Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dextrous movements, or gait and station (see 11.00C).

20 C.F.R., Part 404, Subpart P, Appendix 1, § 9.08 (2007).

Section 11.00(C) provides as follows:

Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.00 (2007).

While the level of impairment in Plaintiff's right lower extremity may satisfy the requirements of Section 9.08, Plaintiff's left lower extremity is not similarly afflicted. Likewise, Plaintiff's upper extremities are not impaired to the extent required by this particular Listing. To satisfy Section 9.08, Plaintiff must be "affected in two extremities." *Conway v. Apfel*, 1999 WL 33657670 at *8 (N.D. Iowa, Mar. 11, 1999). Accordingly, the Court concludes that substantial evidence supports the ALJ's determination that Plaintiff does not satisfy this particular Listing.

B.      Section 1.02

Plaintiff next asserts that she satisfies the requirements of Section 1.02 of the Listing of Impairments. This particular provision is satisfied when the claimant experiences a "major dysfunction" of a "major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02 (2007). Section 1.00(B)(2)(b) provides, in relevant part, as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.00 (2007).

Plaintiff asserts that she satisfies this Listing because she lacks the ability to ambulate effectively as defined by the above provision. While the Court does not mean to minimize the very

16

serious difficulties Plaintiff experiences with her feet, the record does not reveal that Plaintiff has suffered a "major dysfunction" of a weight-bearing joint, as that term is used in the Listing. Moreover, there exists substantial evidence to support the ALJ's conclusion that Plaintiff is able to ambulate effectively, as that term is defined by the Listing. In this respect, the Court notes that there exists evidence indicating that Plaintiff's foot impairments, and consequently her ability to ambulate, have improved with surgery and treatment. In sum, while perhaps a close call, the Court finds that there exists substantial evidence to support the ALJ's determination that Plaintiff does not satisfy this particular Listing.

II.         Additional Evidence

After the ALJ denied Plaintiff's claim, Plaintiff requested that the Appeals Council review the ALJ's decision. In support of this request, Plaintiff submitted additional medical evidence that had not been presented to the ALJ. (Tr. 563-702). The Appeals Council denied Plaintiff's request for relief. Plaintiff asserts that the Appeals Council "erred as a matter of law" by failing to consider this additional evidence.

Where the Appeals Council denies a claimant's request to review an ALJ's decision, the ALJ's decision becomes the Commissioner's final decision. *See, e.g., Carmack v. Barnhart*, 147 Fed. Appx. 557, 559 (6th Cir., Aug. 31, 2005) ("[w]here, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner"). The jurisdiction of this Court extends only to review of final decisions issued by the Commissioner of Social Security. *Id.* ("[p]ursuant to 42 U.S.C. § 405(g), we may review the Commissioner's final decisions"). As the

decision by the Appeals Council not to review the ALJ's decision is not a final decision by the Commissioner, such is beyond the authority of this Court to review.

This Court is likewise precluded from considering the additional evidence Plaintiff first submitted to the appeals council. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) ("[o]nly evidence in the record below can be considered when determining whether or not the ALJ's opinion was supported by substantial evidence"). If Plaintiff can demonstrate, however, that this evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the present case for further proceedings during which this new evidence can be considered. *Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996). To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence. *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988).

While this additional evidence confirms that Plaintiff experiences difficulties with her feet, it is not reasonable to conclude that consideration of this evidence would have resulted in a different outcome. Accordingly, the Court is precluded from considering this evidence and, furthermore, there exists no basis for remanding this matter for its further consideration.

III.         Treating Physician Doctrine

On February 12, 2007, Dr. Seiler was questioned by Plaintiff's attorney concerning Plaintiff's condition. (Tr. 517-20). During this questioning, Dr. Seiler stated, "I don't think [Plaintiff] is able to ambulate effectively" as such is defined by the relevant Social Security

regulations. (Tr. 517). On March 16, 2007, Dr. Seiler was again questioned by Plaintiff's attorney. (Tr. 560-61). During this questioning, the following exchange occurred:

> Q: I just want to ask you some follow up or supplemental questions regarding Bethany Snyder. We've had our hearing since I last talked to you and I just wanted to cover at couple issues with you. At the hearing, she testified that about 80% of the time since March of 2003 when you first did surgery on her that she's been using ambulatory aides either a wheelchair, a walker or the crow walking boot or something of that sort. Now I know it's hard for you to know whether any such estimate of that is precise, but what's your reaction to that testimony?
>
> A: I think that would be an accurate estimate. The amount of time that she has been at least in a surgical shoe, crow walker, Cam walker, walker or wheelchair, all of these are ambulatory aides or things necessary to protect her feet and I would say she very well may have been in something like this for 80% of the past few years.

(Tr. 560).

Plaintiff asserts that the ALJ failed to accord sufficient weight to Dr. Seiler's opinions. Plaintiff asserts that Dr. Seiler's opinions demonstrate that she is disabled and that because Dr. Seiler was her treating physician, the ALJ was obligated to accord controlling weight to his opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not

inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to his assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

With respect to Dr. Seiler's initial statement, the ALJ observed that the doctor "later stated that 'she is able to do some of those things in a limited way,' referring to the examples of non-effective ambulation" articulated in the relevant regulations. (Tr. 27, 518). The ALJ concluded that Dr. Seiler's statement "does not indicate. . .that [Plaintiff] is unable to ambulate effectively. Rather, while it's his advice that she not walk too much, given her history of foot surgeries, he acknowledges that she can perform some of the walking activities described within the Administration's definition of non-effective ambulation." (Tr. 27). As for Dr. Seiler's latter statement that Plaintiff may need to utilize an ambulation aide 80 percent of the time, the ALJ concluded that "such usage, whether 80% of her time or even more, does not equate with an inability to ambulate effectively; it is simply reflective of her need to use a walking-boot when ambulating." (Tr. 27).

While the Court believes that Dr. Seiler's opinions and observations are entitled to significant weight, there exists substantial evidence to support the ALJ's conclusion that Dr. Seiler's opinions are not entitled to controlling weight.

IV.         Plaintiff's Subjective Allegations

In assessing Plaintiff's credibility, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible. (Tr. 24). Plaintiff asserts that the ALJ failed to give proper weight to her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is]

disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531. This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such

evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

The ALJ examined the record and concluded that Plaintiff's subjective allegations of pain and limitation were not entirely consistent with the medical record and her reported activities. While the Court believes that Plaintiff's subjective allegations are entitled to a certain amount of weight, there exists substantial evidence to support the ALJ's conclusion that Plaintiff's subjective allegations do not establish her entitlement to benefits.

V.       The ALJ's Conclusion that there Exists a Significant Number of Jobs which Plaintiff can Perform Despite her Limitations is not Supported by Substantial Evidence

The ALJ found that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. The ALJ, therefore, concluded that Plaintiff was not disabled. Plaintiff asserts that this conclusion is not supported by substantial evidence.

The ALJ found that Plaintiff retains the ability to perform light work subject to the limitations identified above. This conclusion is not supported by substantial evidence. The medical evidence detailed above reveals that Plaintiff is impaired to an extent beyond that recognized by the ALJ. Dr. Seiler's opinion, while not establishing that Plaintiff is disabled, certainly supports this conclusion. Likewise, while Plaintiff's subjective allegations do not establish that she is disabled,

such are credible to the extent that they reveal that she is impaired to an extent beyond that recognized by the ALJ. In sum, the record fails to support the ALJ's RFC determination.

The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite such limitations. However, the ALJ's RFC determination is not supported by substantial evidence. Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff is disabled. In this respect, the Court notes that the record contains conflicting evidence, as the ALJ detailed in his decision. To resolve these conflicts would require the Court to make factual determinations which it is neither qualified nor authorized to make. The Court recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings, including but not necessarily limited to, a determination of Plaintiff's RFC and whether such precludes the performance of work which exists in significant numbers.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: July 30, 2010                      /s/ Ellen S. Carmody
                                    ELLEN S. CARMODY
                                    United States Magistrate Judge